GAIDRY, J.
Plaintiff, Curtis Cousin, claims that he was injured in the course and scope of his employment with Slidell Memorial Hospital. The Office of Workers’ Compensation (OWC) judge, Robert Varnado, Jr., denied Cousin’s claim after finding that Cousin failed to carry his burden of proof that an accident occurred, and Cousin appealed. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
Cousin claims that several hours into his shift on August 15, 2001, while using a stripping machine to remove wax from the floors at Slidell Memorial Hospital, he injured his neck. According to Cousin’s trial testimony, he was tilting the stripping machine to get some wax up when the machine lurched forward, jerking him. He felt a pop in his neck with immediate onset of neck and shoulder pain. He continued to perform his duties and did not immediately report an accident or injury to his supervisor because he did not think anything of it. Some time later, he was having a “slight pain” in the area where he felt the pop, so he approached a nurse. He did not tell the nurse what had happened, but instead requested Tylenol for a headache. He then went back to work stripping the floors, but was only able to work approximately thirty more minutes because he began experiencing a stiffening and pain in the area where he had felt the pop. He became scared that he was having a heart attack because his brother had died at a young age from heart problems, so he went to look for his supervisor, Gilbert Rhodes. While looking for Rhodes, he ran into nurse Christell Olivo and told her that he was scared and asked her about the pain running down his left side. Cousin testified that, “to his knowl *578 edge,” he told Olivo that the pain had labegun while he was operating the stripping machine. Olivo then escorted him to the emergency room and presented him to the triage nurse, Barbara Boles. Cousin initially testified that he was scared that he was having a heart attack and could not recall what he told Boles about his pain or how it began. Later, he testified that he did not know why he had been checked out for heart problems in the emergency room because he did not tell anyone that he thought he might be having a heart attack. He admitted on cross-examination that as far as he knows he did not tell Boles that he had been stripping floors when the pain began, but contradicted his earlier testimony by stating that he told Boles that he felt a pop in his neck, which caused the onset of the pain.
Cousin testified that Rhodes came to see him once while he was in the emergency room. Cousin testified that Rhodes stuck his head in the curtain and asked him how he was doing, he replied that he was fine, and Rhodes left. He said that he did not tell Rhodes what had happened because Rhodes did not ask him. Cousin testified that he did not ask to fill out an accident report that night because that was Rhodes’ job, not his. Cousin admitted that he had been instructed to fill out a First Report of Injury immediately after an incident that caused pain, and in fact had filled out such a report immediately after a previous work-related injury, but did not do so in this case because “it wasn’t no pain. Wasn’t that great of pain.”
When Cousin was discharged from the emergency room at five o’clock the following morning, he went home without speaking to anyone about the accident or how it occurred. Cousin claimed that he called Michael Parker the next morning to report the accident. He stated that he told Parker about the stripping machine, but not the pop in his neck, and Parker told him to fill out a report.
|4Cousin went to see Dr. Clinton Sharp, his family physician, on August 17, 2001, two days after the alleged accident, complaining of left shoulder and arm pain. He told Dr. Sharp at this time that the pain had started while he was operating a stripping machine and that he had gone to the emergency room. Dr. Sharp did a chest x-ray, which was normal, and recommended that Cousin have an MRI, which was not done.[1]
On August 24, 2001, Cousin went to see Dr. Miguel Culasso at the Instant Family Care Medical Center complaining of pain in his left arm, which had begun on August 15, 2001 when he was at work stripping floors and felt a pop in his left shoulder. This is the first time that Cousin mentioned the pop to anyone.
Cousin ultimately was referred to Dr. Gutnisky, a neurosurgeon, who performed a cervical fusion and discectomy. Dr. Gut-nisky testified that there is no way to tell, other than by the history given by Cousin, whether his herniated disc was caused by a degenerative condition or a traumatic injury-
It is uncontested that Cousin had preexisting problems with his neck. On July 25, 2001, Cousin went to the VA Hospital complaining of intermittent neck pain over a period of two weeks and a headache in the back of his head and upper neck lasting for three weeks. On August 9, 2001, Cousin went to Dr. Sharp complaining of neck pain and stiffness and numbness in his hands. Dr. Sharp diagnosed him with *579 cervical arthralgia. Cousin testified that his pre-existing neck problem was different from the pain he had after the accident and also that the pre-existing neck problem had been fully resolved by the time of the accident.
At trial, evidence was presented that contradicted Cousin’s testimony. Nurse Christell Olivo testified that Cousin approached her in the hallway of | Bthe hospital and told her that he was having left arm, neck, and chest pain. She testified that she does not recall Cousin indicating to her what he was doing when the pain began, but did state that if Cousin had told her that he was operating a stripping machine and felt a pop in his neck and the onset of pain, she would not have suspected a heart problem and would have instructed him to file an accident report.
Barbara Boles, the triage nurse, testified that Cousin presented to her complaining of “left chest pain, to his neck, down his left shoulder, and left arm.” He told her that he had been having these symptoms for three days. When asked if anything relieved the pain he was experiencing, Cousin told Boles that sitting and relaxing helped. Furthermore, when asked if he had been involved in any kind of accident, Cousin denied injury. Boles testified that Cousin did not tell her about the pop he felt in his neck while he was operating the stripping machine, and if he had, she would have indicated on her report that this was a work-related illness and that he was a Workwise client and would have advised him to fill out an accident report. If he had even mentioned that he had been stripping floors when the pain began, without mentioning the pop, she still would have taken these additional actions.
Gilbert Rhodes, Cousin’s supervisor, testified that he first became aware that Cousin was having a problem when another employee told him that Cousin was in the emergency room. Rhodes went to the emergency room and found Cousin in triage. When Rhodes asked him what had happened, Cousin told him that he had pain in his neck going down his arm. Cousin also told him that he had high blood pressure and was not taking any chances, so he went to the emergency room. Rhodes did not ask Cousin what had caused this pain, but he testified that Cousin did not tell him that | fihe had had any sort of accident or that his neck pain had been caused by operating the stripping machine. Rhodes testified that if Cousin had told him that the pain had begun while he was stripping the floors and felt a pop in his neck, he would have filled out an occurrence report. Later, while Cousin was in the examining room, Rhodes went to see him again. Cousin again did not tell Rhodes about feeling a pop in his neck while stripping the floors.
The emergency room report of Dr. Archie Tatford states that Cousin presented to the emergency room complaining of left neck, shoulder, and arm pain while working on the floors that evening. Cousin denied any chest pain to Dr. Tatford, but Tatford noted that Cousin had reported chest pain to both the charge nurse and the triage nurse. Cousin described the pain as a previous pain he had seen Dr. Sharp for, which had been occurring off and on for three days but had worsened that evening.
Upon review of the evidence, the OWC judge found that Cousin failed to carry his burden of proving a work-related accident. Specifically, the OWC judge noted that Cousin had multiple opportunities the night of the alleged accident to describe the accident and how his neck “popped,” but he did not, and therefore he failed to provide sufficient corroboration of the alleged accident. The OWC judge stated *580 that it was ultimately a credibility call as to what happened immediately following the alleged accident, and Cousin failed to carry his burden by a preponderance of the evidence that he sustained an accident. Cousin’s claim was dismissed with prejudice.
Cousin appealed this judgment, alleging that the trial court clearly erred in concluding that he did not sustain an on-the-job accident on August 15, 2001 because he failed to carry his burden of proof that an accident occurred.
I DISCUSSION

Standard of Review

Cousin first argues that although a trial court’s determination that a work-related accident did not occur is normally subject to the manifest error or clearly wrong standard of review, Bruno v. Harbert Int’l, Inc., 593 So.2d 357, 361 (La.1992), under Bolton v. B E & K Construction, 01-0486 (La.App. 1 Cir. 6/21/02) 822 So.2d 29, this court should conduct a de novo review of the evidence, giving no deference to the OWC judge’s findings, because the OWC judge relied on incompetent evidence in reaching his decision.
Specifically, Cousin alleges that the testimony of nurse Christell Olivo, triage nurse Barbara Boles, and supervisor Gilbert Rhodes was not competent and should not have been relied upon by the OWC judge. Cousin argues that because Olivo testified that she vaguely remembered the incident and could not recall Cousin telling her that he was injured while operating a stripping machine, Cousin’s testimony that he informed her that he was injured while stripping the floors was uncontradicted. Because of this, Cousin claims that Olivo’s testimony was incompetent evidence and should not have been considered by the trial court. Cousin also argues that Boles’ testimony was incompetent and likewise should not have been considered because she had no independent recollection of Cousin’s emergency room visit and could testify only after refreshing her recollection with her report. Cousin also asserted that Boles’ testimony was incompetent because the report she relied upon to refresh her recollection contained one error[2] and |shad another question left blank[3], and it could possibly contain other errors. Finally, Cousin alleges that the testimony of Gilbert Rhodes is incompetent evidence because he failed to fill out a report immediately as he should have done even if he thought Cousin was only having a heart attack at work. According to Cousin, since Rhodes did not perform his job correctly, his testimony should be disregarded.
If the OWC judge committed evi-dentiary error that interdicted his factual decision, this court would conduct a de novo review rather than a manifest error review. Bolton v. B E & K Construction, 01-0486 p. 3-4 (La.App. 1 Cir. 6/21/02), 822 So.2d 29, 32. Thus, the evidentiary issue must be addressed first.
OWC judges are not strictly bound by the technical rules of evidence. La. R.S. 23:1317(A). The applicable statute only requires that all findings of fact be based upon “competent evidence.” Bolton, 01-0486 at p. 3, 822 So.2d at 32. The basic *581 concept of competency is that a witness may not testify to a fact unless a foundation is laid from which the trier of fact could conclude that the witness has personal knowledge of that fact. La.Code Evid. art. 602. If a witness lacks memory of events he or she witnessed, the facts may be recaptured by “jogging” the witness’ memory, either prior to or while the witness is testifying. La.Code Evid. art. 612.
The problems Cousin refers to with the testimony of Olivo, Boles, and Rhodes have nothing to do with their competency to testify; rather, these are credibility issues. Since the testimony of these witnesses was indeed competent evidence, we will not conduct a de novo review.
The applicable standard of review in this case is a two-part test: (1) the appellate court must find that from the record that there is a reasonable factual basis for the trier of fact’s findings, and (2) the appellate court must further determine that the record establishes that the finding is not manifestly erroneous (clearly wrong). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993); Sistler, 558 So.2d at 1112.

Proof of an Accident

Cousin argues that the OWC judge erred in finding that he did not meet his burden of proof that an accident occurred. An employee who sustains a personal injury by accident arising out of and in the course and scope of his employment is entitled to collect workers’ compensation benefits from his employer. La. R.S. 23:1081(A). The workers’ compensation claimant has the burden of proof to establish that a work-related accident occurred by a preponderance of the evidence. Bruno v. Harbert International Inc., 593 So.2d 357, 361 (La.1992). In determining whether a worker has shown by a preponderance of the evidence that an injury-causing accident occurred in the course and scope of employment, the trier of fact is expected to focus on the issue of credibility because, absent contradictory circumstances and evidence, a claimant’s testimony is afforded great weight. Id. In Bruno, the Louisiana Supreme Court stated that a Imworker’s testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident, and (2) the worker’s testimony is corroborated by the circumstances following the alleged incident. Id. Therefore, if the worker testifies that he suffered an accident, a court must then look to see if the Bruno elements are satisfied. Coats v. American Tel. & Tel. Co., 95-2670 p. 5 (La.10/25/96), 681 So.2d 1243, 1245.
In the instant case, the OWC judge found that Cousin’s testimony regarding the occurrence of the accidence was not credible and that he failed to prove that an accident occurred. In his reasons for judgment, the OWC judge noted that Cousin had multiple opportunities the night of the alleged accident to describe how he had been injured, but he did not do so, and thus he failed to provide sufficient corroboration as to the alleged accident. Therefore, we must review the record to *582 see whether the OWC judge was manifestly erroneous in finding that Cousin had not satisfied the elements of Bruno and thus failed to prove by a preponderance of the evidence that he suffered a work-related accident.
The OWC judge was not manifestly erroneous in finding that the second prong of Bruno, which requires that Cousin’s testimony be corroborated by the circumstances following the alleged event, was not satisfied. Cousin spoke with at least four different people at Slidell Memorial after his accident occurred — nurse Olivo, nurse Boles, Dr. Archie Tatford, and supervisor Gilbert Rhodes — but none testified that they were told about the stripping machine and the pop in his neck. Although Cousin argues that he did in fact tell nurse Olivo, nurse Boles, and Dr. Tat-ford about operating the stripping machine and feeling a pop in his neck, this is 111 contradicted by Olivo’s and Boles’ testimony and by Dr. Tatford’s report. The first mention in the record of the pop in Cousin’s neck is on August 24, 2001 in Dr. Culasso’s records. With the conflicting testimony concerning the circumstances surrounding the alleged accident, the OWC judge made a credibility call and discredited Cousin’s version of the events.
An OWC judge’s determinations as to whether a claimant’s testimony is credible, and whether the claimant has discharged his burden of proof, are factual determinations which will not be disturbed on review absent manifest error. Bruno, 593 So.2d at 361. After a thorough review of the record, we are unable to find manifest error in the findings of the OWC judge. Cousin provided no credible evidence to corroborate his testimony. There are two permissible views of the evidence in this case: (1) Cousin told the truth and there was an accident, or (2) Cousin did not tell the truth and there was no accident. The OWC judge chose the latter and did not commit manifest error in so doing.
DECREE
For the foregoing reasons, the August 5, 2002 judgment dismissing Cousin’s claim with prejudice is affirmed. All costs of this appeal are cast to Cousin.
AFFIRMED.

. Apparently, Cousin did not have an MRI at that time because his insurance company would not pay for the MRI.

. On the triage report, Boles recorded on the pain scale that Cousin’s pain would range from a 5 at best to a 2 at worst. She acknowledged at trial that this was an error and she should have recorded his pain as 2 at best to 5 at worst.

. On the last page of the triage report, there was no response entered following "Date of Onset of Pain;” however, in the narrative portion of the report, she noted that he had been experiencing this pain off and on for three days.